Good morning. May it please the Court, I am Justin Augustine on behalf of Appellants. I would like to please reserve four minutes for rebuttal. Thank you. Sure. Plaintiffs respectfully ask this Court to reverse the District Court decision and issue a preliminary injunction in order to protect occupied California spotted owl territories while the Forest Service corrects its NEPA violations in this case. Forest Service violated NEPA because they failed to analyze and divulge to both the public and decision makers the impacts of logging thousands of acres of severely burned forest in what are known to be occupied owl territories on the Rimfire landscape. This matters for two key reasons. Number one, scientific literature in the record of this case establishes that in a post-fire landscape, California spotted owls, when they are looking for the food that they need to survive, prefer to find that food in the most severely burned forest. And number two, excuse me, in the most severely burned forest that has not been logged. And number two, we know from the scientific literature in this record that post-fire logging of spotted owl territories can in fact lead to those owls no longer being able to survive in those territories. This Circuit has already addressed this issue before in Earth Island 2, the 2006 Earth Island case cited in our briefs, and that Court determined in an analogous situation that the failure to address foraging habitat, the owls' preferred foraging habitat, violated NEPA. Is it your position that the Forest Service did not address it all? Any of this information that you're bringing to our attention right now? Yes and no. Because if you look at the EIS, the final EIS, and the record of decision, there's discussion of this. That's correct, Your Honor. They addressed the science. They acknowledged the existence of the science. They conceded the science. But they did that in Earth Island 2 as well. And the failure under the law, however, is to actually analyze what that means on the landscape. I don't mean to be trite or anything, but I think the District Court said really what's at play here is you have one scientific understanding and position. The Forest Service has considered it, and their experts have said, well, you know, it's not, shouldn't foreclose us from going ahead, and we'll make some adjustments in light of all this information. I think it was the District Court judge who said, well, this is just conflicting experts. No, Your Honor. This is not conflicting experts. And in that situation, how can we say that it's an abuse of discretion for the Forest Service to take the position that they did? This is not conflicting experts, and this is Earth Island 2 because we know, number one, that there is no conflicting evidence saying that spotted owls do not use severely burned forest to find the food they need to survive. Rather, the evidence, the only studies in the record about this issue found just the opposite. They determined that owls prefer burned forest in a post-fire landscape. There is no other study contradicting that. There are no studies contradicting the fact that in a post-fire landscape, when salvage logging occurs, it can result in loss of occupancy. No study says salvage logging does not result in loss of occupancy. So, number one, there really is not this battle of the experts, but more importantly, it's not just about certainty. Under Earth Island 2, and all NEPA case law, in fact, it's about the potential for adverse impacts. And it's about divulging to the public what those potential adverse impacts are. And the way to do that here is to, under the law, the Forest Service has to consider all relevant factors. Foraging habitat is a relevant factor for the basic reason that owls can't survive without food. And importantly, and the reason plaintiffs went out of their way to present all these maps to the Forest Service, is that it's not just about food anywhere on the landscape. When you go to the grocery store, if you live in San Francisco, you don't drive to Sacramento. That's too far away. You go to the grocery store here, even if there's a better one in Sacramento. And it's the same thing with spotted owls, Your Honors. Where foraging habitat is in relationship to their nests and roosts matters for them to be able to survive. The only study in the record of a post-fire landscape found that the most important foraging habitat is that habitat that exists within 1.5 kilometers of a nest or roost for now. And therefore, the Forest Service, while they don't have to adopt the 1.5 kilometer standard, they do need to come up with analysis that actually accounts for foraging habitat. When you only analyze, as they did here, protected activity centers, which is what they did in Earth Island 2 as well, you leave out a relevant factor. How can you protect owls when you don't allow them to get the food they need to survive because there is substantial logging occurring in those very places? And that's a factor that they failed to address here. Even more importantly... In the environmental impact statement, didn't they... You're talking about the Clark and the Bond studies? Is that what you're referring to? Yes. Okay. And so didn't the environmental impact study address... Are you talking about the Clark study, the 2007 study? About the high-severity burn cover type and the owls going to those areas? Didn't they look at that and they concluded that the use of the high-severity burn cover type was low, and therefore their conclusion and analysis was it's actually a poor habitat for the owls. And if so, is that a reasonable description? Or do you think they poorly described it or their analysis was defective for some reason? Right. Clark 2007, to put it in context, was one of the first studies to examine post-fire landscapes in owls, and it's the northern spotted owl, not the California spotted owl, but it's still highly relevant. And we went to great lengths to point out that that was a mischaracterization of Clark 2007, and I'll quote from Clark 2007 at SCR 210 to 211. While these areas may not provide high-quality habitat, they likely provided benefit to owls because owls did make use of these stands. That is not what poor habitat is. When it's providing a benefit, it's important to the owls. But more importantly, three years later, and it's the same data that was at issue in Earth Island 2 in 2006, the bond data, that data that this circuit found to be relevant even before it was published did get published in a peer-reviewed journal. That's Bond et al. 2009. And specific to the Sierras, specific to California spotted owls, it found not only owls benefiting from severely burned forests but actually going out of their way to use that forest the most. And that's the only study in the record of California spotted owls and what they do in a post-fire landscape. Well, Clark in 2013 suggests that it's not nearly as clear. Indeed, the specific observation is that the few studies that have been conducted on spotted owls and burned landscapes have provided equivocal results regarding the effects of wildlife on the species.  In fact, the results in other studies overall have been equivocal, according to Clark. It's not nearly as clear as you've suggested, at least from the perception of those authors. It is clearer than that, however, Your Honor. And I point you to Lee et al. 2012, which is specific to the Sierras, and they studied what happens to owls. Why aren't you picking and choosing by pointing me to something else? Why aren't you saying, okay, I like these experts and not those experts, which is exactly the point I think the district court made? No, that is definitely not what I'm trying to do, and let me... I assume it's not what you're trying to do, but it sure sounded like what you did. No, let me be clear, Your Honor. What we have, Clark 2007 is the starting point, and they found a benefit. Bond 2009, preferred foraging habitat. Lee et al. 2012, and I'm going to get to Clark in just a second, but I believe this is important context, so forgive me. And it says, at ER 261, the forest fire, particularly high-severity fire, is generally presumed to reduce occupancy. Our results do not support this presumption and instead corroborate previous studies that found occupancy not diminished by forest fires. That's relevant and important to your question because it shows that the one study in which they looked and isolated fire in the Sierra Nevada for California spotted owls did not find that fire alone was the problem. We get to Clark. There are a lot of studies out there that counter conventional wisdom. The fact that there's a study that counters conventional wisdom doesn't by itself mean conventional wisdom can't be right. That seems to be what you're arguing to me, because even what you quoted states the conventional wisdom, that is, that the fires presumed to have this effect. And it's not an illogical conventional wisdom, is it? Not an illogical presumption. But the science contradicts it. One study of science contradicts it, and Clark the next year says the results have been equivocal. Well, I would argue, Your Honor, that once you have science that contradicts the conventional assumption, you can no longer apply conventional science. One study is not science, is it? It's the best available information. I mean, I can find one study of science that will prove most anything. Why aren't you giving us one data point and a sea of data points? Well, two reasons. Number one, Earth Island tells us, the circuit's saying, that you cannot ignore even preliminary data. The Leodaw I just pointed to found in a published journal that fire wasn't the problem, and Clark et al. found the problem was the combination of fire and salvage logging. Therefore, we can assume that salvage logging is at least a potential problem, and that's the standard under NEPA, not certainty. So what the Forest Service was required to do is take a hard look. Not necessarily reach the conclusion you want to do, but take a hard look. And all of this material is in the record. What is it that tells us the Forest Service consciously disregarded some portion of it in reaching its conclusion? Because there is no science to support their conclusions, Your Honor. The science in the record is best established by what plaintiff's position is here. But this is not a battle of the experts. It's about what is required under NEPA for a proper analysis. And in North Island 2 as well, they talked about, quote, the actual impacts of the proposed projects. That's all we're asking for here, Your Honors. It's not a particular outcome. For the Forest Service to take the science and what it might show in terms of adverse impacts, apply that to each of the occupied AL territories. They can't say that they don't have site-specific data. And in light of that site-specific data, which is the owls, nests, and roosts, they can do an analysis that Earth Island called for in terms of figuring out what are the potential adverse impacts of logging substantial acreage within each of those AL territories. And we know from the maps, like AR ER 826, that shows all the territories that are at risk in this injunction. And in each one of them, you can see substantial logging that would occur within an AL territory. Now, the other side keeps saying about, well, there might be abundant foraging habitat elsewhere. But when you look at the maps, there are 39 occupied territories out there. If you take away from one, that requires that owl to start competing with others, which leads to starvation and death as well. Because just like you and I, if you lose your kitchen, your grocery store, and you have to start going elsewhere, there's going to be less of a finite resource. So all these 39 occupied territories have to share the same finite resource. And therefore, at the very least, the Forest Service needs to divulge and analyze how that relationship plays out. Will each of these 39 territories have a little bit of logging that impacts them or a lot? And we showed that there is the possibility, the potential, for substantial logging within many of these territories. And this is not just a species or any species. It's a sensitive species. They didn't acknowledge the importance of that in failing to make this assessment. And they're failing to acknowledge the importance of the decline of this species in recent years. It is on its way to needing listing under the ESA because it's in a serious decline. And the literature and the record proves that, as we state in our briefs. There's no contravailing evidence on that issue. By the way, what was the precise relief you were seeking from the district court? I apologize. Can you repeat that? What was the precise relief you were seeking from the district court? No logging within the 1.5-kilometer territories of occupied California spotted owl territories. And to be clear, Your Honors, that was a very narrowly tailored injunction. They can go forward with quite a bit of logging outside of that, so we're not precluding them from doing a substantial portion of this project. All we're doing is requiring them to divulge to the public what is a potential serious impact here, the loss of the food that these owls absolutely need to survive. There is no evidence in the record to suggest that they can survive without their food. What impact or what significance of any should we place on that August 28, 2014, memorandum to the administrative record? Didn't they articulate why your side's analysis of the survey data didn't warrant changes? No, what they did there, again, is minimize the science but without actually doing the analysis that the circuit has demanded. And I would also add that a letter to the record is not NEPA analysis. It's not in the DEIS. It's not in the FEIS. It's not in the ROD. That's a critical problem here, Your Honors, is that the public doesn't even know that there are 39 occupied territories out there, doesn't know that there's a potential for them to die because of the loss of their food, and that is a core NEPA violation in terms of informed public participation. And I'll reserve the rest of my time for rebuttal. Thank you, Counsel. Good morning, Your Honors. I'm David Gunter from the Department of Justice here on behalf of the Forest Service. With me at Council table is James Rosen from USDA Office of General Counsel, and I'm going to argue for 15 minutes with the Court's permission and reserve five minutes for Mr. Horngren, who's representing the interveners. The Rim Fire Recovery Project is an environmentally beneficial project that was a necessary response to a fire that devastated 400 square miles in the Sierra Nevada. It will help prevent future fires, improve soils and watersheds, improve wildlife habitat, and provide for the public's safety. And it's also a great example of informed agency decision-making under NEPA. Before this fire was out, the Forest Service had already begun the process of engaging interested stakeholders in developing a recovery project. And that's a recovery project that requires tradeoffs. The Forest Service was open about this, particularly at page 17 of the rod, where it talked about the tradeoff between the short-term potential benefit to wildlife of burned habitat and its absolute long-term priority of preventing severe fires, which will threaten green habitat, which even plaintiffs concede the spotted owl depends on, for nesting and roosting. Now, almost everybody with an interest in the Rim Fire Recovery Project thinks that the Forest Service made reasonable tradeoffs. Our final proposal had the support of timber groups, environmental groups, and local and tribal governments. And the plaintiffs, to the exception, based solely on a substantive disagreement with the Forest Service's scientific conclusions. They're arguing what's in the best interest of the spotted owl. But the Forest Service has already determined that the greatest threat to the spotted owl is stand-replacing wildfire. And the purpose of the recovery project is to ensure that those fires will not be as severe in the future. So this Court's role is not to sort out who's right in that scientific debate. It's simply to determine whether the Forest Service took a hard look at these issues and explained its reasoning in the record. The record has that explanation. It responds to every one of the studies and every one of the points that the plaintiffs are presenting to this Court. Let me ask you about the issue of whether the logging will reduce the risk of future severe fires. There was a suggestion by plaintiffs that, in fact, although that was presumed to be the case, that's not true. Is that something that the Forest Service took up? Yes. I wouldn't say that it's not true. I would say that it's not absolutely certain. If the Court will look, I think, at page 14 of the Rod, but certainly in the Rod, the Forest Supervisor, in making her decision, specifically said that she understands there is uncertainty and debate about whether this kind of fuels reduction treatment will reduce future fires. But she also said, my highest priority is to do everything I can to make sure that this won't happen again. And so the Rod is open about these tradeoffs, and it describes them. The Rod and the EIS are also open about the Forest Service's analysis of the studies that the plaintiffs are relying on here. And as in his briefs, Mr. Augustine, in his argument, relied on Bond's 2009 study and Clark's 2013 study, and also on Lee and Bond's 2012 study. When the Forest Service looked at those studies, it said, we don't believe that these studies carry the weight that the plaintiffs believe they should carry. And I'll give you one example. The plaintiffs in their briefs say that post-fire salvage logging in spotted-owl territories has been found to dramatically reduce or completely eliminate occupancy. But if you go to the page in Lee and Bond 2012 that they cite for that proposition, what it says is that post-fire logging may have adversely affected rates of occupancy of the burned sites. But our sample size was too small for this effect to be included as a covariate. So the Forest Service has scientific experts and Ph.D. owl biologists and an interdisciplinary team whose job it is to assess the weight that the studies that are in the existing literature should have, and the degree to which the lessons of those studies are transferable to the rimfire area. Another example is Bond 2009, which the Forest Service discussed not only in the memo that Judge Kobayashi mentioned, but also in the EIS at page 341, and in response to comments in the EIS in page 691 and 718. It has an extensive discussion of Bond 2009, trying to suss out whether that study presents conclusions that are applicable to the rimfire area. And the Forest Service said it doesn't. The reason is that that study considered a small number of owls who were foraging four years after a fire that had burned a smaller percentage of the owl's territory at high severity. And so it said, more research is needed. As the Bond 2009 study itself says, more research is needed on these issues. And the Rimfire Restoration Project includes studies that will be conducted by the Pacific Southwest Research Station of the Forest Service to provide the kind of data that we're now trying to infer from studies of smaller sample sizes, different areas, and different kinds of fires. So the Forest Service did not ignore these studies. It considered them and weighted them with the weight that its own experts believed was appropriate. And the district court understood this. It said, I'm not going to allow a battle of the experts that will try and persuade me to overturn the substantive scientific decisions that the Forest Service has made. And that's fully consistent with this court's NEPA case law. So they make a big argument based on Earth Island Institute. I guess it's two? Yes. The one at 442. Yes, right. So how are they just – tell me why they're wrong. Well, we believe this case is different. That case also involved studies by Monica Bond, the owl biologist, as they say here. Same cast of characters. That's right. And in that case, the Forest Service had said, these data are preliminary, and so we're not going to consider them. Here, what the agency did was very different. It looked at that study over and over in the record, and what you see is a progression of more and more detail on this issue, culminating in the response to comments, which was very detailed, and finally in the memo that it put into the record on the same day as the record of decision. So Earth Island Institute, this court said, the agency can't ignore studies just because it's preliminary or the agency doesn't think that they should count. Here, the agency substantively engaged with all of those studies and explained in the record why it gave them a particular weight and how it was influencing its decision based on those studies. Let me also address the point that the Forest Service didn't disclose the actual impact of its logging in the record, and particularly the idea that there are 39 occupied owl territories that were not disclosed in the record. The reason that that doesn't demonstrate a NEPA violation here is that the Forest Service's analysis was not based on owl detection. It was based on owl habitat, which is important because if the Forest Service has identified a habitat area, it shouldn't be able to conduct activities like logging that area just because an owl may not be detected there at a particular time. So here, the Forest Service has a longstanding practice, dictated by its forest plan, by the Sierra framework, which governs all forests in the Sierra Nevadas, of using protected activity centers and home range core areas as its analysis points for impacts on owl habitats. And it did that here with respect to every single one of the areas where an owl was detected or where the Forest Service considered viable habitat for an owl. So it's not necessary for the Forest Service to disclose the actual areas where owls are detected, because all of those areas are being protected anyway and are subject to the protection that the governing documents put in place for those habitat areas. The Forest Service explained this in the record, particularly at page 19 of the record of decision, that it was getting data as the summer went on  and that when it received that data, it would re-establish any protected activity centers where owls were shown to be occupying, and it would grant those areas the same protection that was granting all the other areas discussed in the record that owls may occupy. So in my view, that really undermines the argument that plaintiffs are making that the Forest Service failed to disclose to the public what it was doing or that it failed to consider new survey data. The Forest Service only has to supplement the EIS if new survey data substantially changes the scope of the action or the environmental consequences of the alternatives. That's language from the broad, but it tracks this court's language, for example, in Tri-Valley Cares, and the Supreme Court's language in Marsh about when supplementation is needed. And here, the agency determined that the data about owl detection didn't substantially change the scope of the action, except that additional PACs needed to be established. So it established those PACs, explained in the record of decision what it had done, and then included in the record explanation of why it believed that that was sufficient. Let me briefly address the question of whether the District Court erred by not supplementing the administrative record with additional expert declarations from the plaintiffs. The key case that this court can look at for that question is San Luis and Delta Mendota, the court's decision from last year in the Delta Smell case, in which it said the District Court really has the discretion to determine what additional help the District Court might need in understanding these issues. Here, the plaintiffs are suggesting that not only the public, but also the District Court needed help in understanding the scientific issues related to owls, owl habitat, and owl occupancy. And in San Luis, the court said the plaintiffs are not allowed to set up a battle of the experts on that question. It allowed the District Court to accept additional expert help where it needed it. But here, the District Court didn't need that. The EIS explains in plain language how the Forest Service was considering the various studies in the record and what decision it was making. So there's certainly no need to overturn the District Court's exercise of discretion on the record for judicial review of this issue. Were they only offering those declarations just for the purpose of judicial review of the record, or were they also offering them on the preliminary injunction question, irreparable harm? They offered them on the question of irreparable harm. The Forest Service responded with the declaration of Patricia Manley on the question of irreparable harm. And the District Court did not actually end up considering any of those because it concluded that simply on the merits a preliminary injunction is not warranted here. So the plaintiffs also asked to have those declarations considered on the merits. But as the court knows, this is an APA review case, a record review case, and it's limited to the record before the court. The last thing I'd like to address, although Mr. Horner may address this in more detail, is the equities in this case. As you know, the District Court didn't reach the equities because it correctly concluded that on the merits, there's no meritorious NEPA claim here that can justify any injunctive relief, even if it's tailored. And this court can take the same approach. But if you decide to reach the equities, the Rim Fire Recovery Project certainly is in the public interest, and an injunction against that project will do more harm than good with respect to the public interest. The harm to a potential injunction includes environmental harms and economic harms. The environmental harms include the need to avoid future severe fires, which would threaten the green habitat where existing spotted owls are occupying. There's also a need to restore watersheds and soils by strengthening watercourses and increasing ground cover that was destroyed by the Rim Fire where it burned at high severity. But there are also economic harms to the local community, a factor that the Forest Service is required by statute to consider and that this court also should consider. Now, this public interest is demonstrated by the fact that the Rim Fire Recovery Project is supported by a broad spectrum of stakeholders. And really, an injunction here does make a difference to whether important parts of that project can go forward or not. My conclusion in this argument is that NEPA generally, and here, requires the court to apply a rule of reason to decide whether the Forest Service took a hard look and reasonably considered all the factors that are relevant to its decision. Here, the agency did that from the very beginning. The Rim Fire is a natural disaster that received national media attention. The agency knew that it was going to be under a microscope. And it was designing a large and complex project where it had to consider not only owls, but also a wide variety of other species and a variety of other environmental considerations, which are all set forth for the court in the EIS. It analyzed every aspect of that project in detail, responded to every substantive comment that the plaintiffs raised. In more detail, as time went on, and the plaintiffs continued to press those comments, it took into account new data as it was becoming available, and it did so on short timeframes and with a high urgency. That sets the standard for NEPA review. It follows every rule that this court has identified under NEPA for informed agency decision-making. So the district court was right to deny a preliminary injunction here, and this court should affirm. What's the status of the two projects that were released, where they were actually doing the logging? Yes, there are three sales. One of them there's no logging on because no contractors have accepted that. The other two, one of them is about 50% complete, one of them is about 80% complete, and activities are ongoing right now. I understand that conditions are good for it right now, and it's underway. Unless the court has further questions, we'll simply ask that the denial of a P.I. be affirmed. Okay, thank you. Thank you, Your Honor. Scott Horngren on behalf of Tuolumne County and the other interveners with me this morning is Supervisor John Gray and County Counsel Sarah Carrillo. The Rim Fire burned a huge area of the forests and watersheds in the county, and those watersheds and forests provide drinking water, water for irrigation and livestock, recreation and wildlife habitat. And the county believes that even if you dismiss, as plaintiffs urge in their briefs, the significant monetary benefit in the balance of harm equation, the environmental and resource benefits of the Rim Fire recovery still tip the balance sharply in favor of the fuel reduction occurring within the project. This isn't the first fire that's burned in the county. There have been many fires in the past, and significantly the Rim Fire overlaps a large portion of the 1987 Stanislaus Complex Fire. The supplemental excerpt of record, the inter-supplemental excerpt of record at 106 shows a map of all the prior fires in the area. And the county believes it's in the public interest to take steps to avoid another major fire. Leaving the excessive tons per acre of dead fuel unsalvaged in the Rim Burn area will just make a future fire more difficult to control and magnify the destructive force of the fire's harm to soils and watersheds. Tuolumne County is a recreation destination, home to ranching families and the location of sawmills that pay good wages. The interveners want to see a forest re-established and have a fighting chance to grow to maturity to provide clean water, recreation wildlife habitat, and a supply of timber. The Forest Service said it best when the EIS explains, quote, if all the current standing fuels were left in place across the landscape, the fire intensity during the next event would destroy most if not all the recovering vegetation and cause much greater soil damage than the Rim Fire. A concrete example of these points is illustrated by the experience of the Crook family. The Crook Ranch lost their irrigation system, cattle, an 1880s-era cabin, and all their forest in the Rim Fire. I've provided for the court, and it's in the record photograph of the Crook property. And the photo shows the heavy fuel loads to the left of the Crook Ranch property on adjoining national forest lands. The Crooks have repaired their fences, rebuilt their water system, salvaged dead trees, and planted seedlings. The largest landowner in the area, Sierra Pacific, has done likewise. The Crooks are not only concerned with fuel reduction immediately next to their ranch, but also that fuel reduction occur on a landscape scale throughout the burned area. Their ranch was burned on August 22nd when the fire exploded, covering 8 to 10 miles in a single day. And the map that you have also from the record shows the Crook Ranch in the middle of an orange area, and each one of those squares is one mile long. And it shows that during that day the fire traveled tremendously. And the Nevergreen AAA and Double Fork projects that plaintiffs want to enjoin are just a few miles south and west of the Crook Ranch. To achieve the fuel reduction depends on the ability to remove the dead trees, and that's a distinction from Earth Island 2. We're talking about completely dead trees here, not trees expected to die, which the court was concerned about that they were overestimating that. The Forest Service has a window of opportunity to do that by getting a timber buyer to pay for the dead trees, but this window of opportunity is fast closing as decay and deterioration take its toll. Once the value is lost, the Forest Service will have to pay a contractor to remove the dead trees, which will preclude the fuel reduction because of the high costs involved and the limited markets for the deteriorated wood. Finally, we'd echo what the government said. What's being done in the third area where no contractor accepted the terms? Nothing right now. So what will happen? It's likely going to burn again. The tons of fuel that are on those areas that you see in the picture are well in excess of 20 to 30 tons, and the Forest Service wants to get it down to 10 to 20 tons, and the Forest Service has done the best job it can to try to identify the strategic location where they're going to put these sales, like near Hetch Hetchy, along ridgetops. And so we believe, as interveners, it's important to get that done, but we're running smack up against the practicalities, which gives them a de facto injunction, at least on that sale, that not all this is commercial. The smaller material particularly deteriorates more quickly, and that becomes a problem because nobody wants to pay. Now, the Forest Service may decide on some of these areas, I suppose, as they have in other areas, that they are in fact going to pay a contractor to do that, but the money runs out pretty quickly trying to cover 257,000 acres that way. So we would urge you on behalf of interveners, including the Yosemite Stanislaus Solutions, which includes Central Sierra Audubon Society, the Central Sierra Environmental Resource Center, and Tuolumne County Alliance for Resources and Environment to deny the injunction. We conclude by emphasizing this is an APA case, and under the motor vehicles manufacturer factors, the Forest Service should be reversed if they fail to entirely consider an important aspect of the problem. Here they did not. You look at that EIS. It's full of discussion about OWLS and EISs. They actually did surveys in areas, the high-intensity areas, they did find OWLS, and they put restrictions on those, and thank you for the time this morning. Thank you, counsel. We appreciate it. You have a few minutes for rebuttal. Thank you. Thank you, Your Honors. I want to go back to the key points here. Number one, they have never told the public that there are occupied territories. That's a big deal because the Forest Service asserted in the DEIS and FEIS that many of these territories would not even exist in the first place. But what's most important here is that they keep coming back to this idea of they're allowed to focus on the PAC, the Protected Activity Center. But just like you and I, I want to reiterate, you could not survive in your bedroom alone. You need a kitchen. You need a grocery store. And the Forest Service has admitted this. At ER-686, they state that focusing on PACs is not an adequate conservation strategy. And, quote, the distribution and abundance of OWL habitat surrounding PACs are critical considerations. So my point in this case is not about the battle of the experts or anything of that sort. It's about failing to analyze an important aspect of the problem, failing to analyze relevant factors. And, again, under Earth Island 2, you can't just say we looked at the science. You have to say, what does that potentially mean? Not does it mean, but potentially mean in terms of adverse impacts to the OWLs. And the only way to do that is to look at foraging habitat surrounding the PACs. Every single record site that they point to talks about salvage logging and PACs. But, again, you can't analyze the impacts of salvage logging foraging habitat because it's not in the PAC. It's surrounding the PAC. And that's why I gave the maps to the clerk because one of those maps, ER-780, you can really see, Your Honors, that surrounding that roost, all these are logging units. That would be the places these OWLs would go to find their food. And yet they can't if those areas are logged. And that's the basic analysis is to divulge that to the public and show them, hey, here's a potential. Well, what's a protected activity center? My impression was that it was an area of like 300 acres or something. That's correct, Your Honor. Is that bigger or smaller than a circle of 1.5 kilometers? It's exceptionally smaller because it only focuses on protecting the nesting habitat. It has no other purpose. And don't get me wrong, this is a very important purpose. Nesting habitat is essential, but just as essential is the foraging habitat, and that's the much bigger 1,700-acre area. That's another 1,400 acres approximately that is going unanalyzed because they were only willing to look at the PACs. Where does the 1.5-kilometer measure come from? Is that a standard of some kind? It's not a standard in the Forest Service, but it's from the bond. Is it a standard of anybody? Repeat that, I'm sorry. Is it a standard of anybody? Bond et al., that was her recommendation based on her data showing that. So it's one study? It is one study, but it showed that within 1.5 kilometers of an owl's nest or roost, the most valuable areas to it are the most severely burned forest within that 1.5-kilometer area. I'm not saying the Forest Service has to use that 1.5, but they do have to go beyond the PAC because otherwise you're not analyzing an important aspect of the problem, the ability for these owls to survive in terms of the food they need to eat. That was the basis for your request for the preliminary injunction with the 1.5. Likely to succeed on the merits. Thank you, Your Honors. Okay. Thank you, counsel. We appreciate your arguments. Have a safe trip back. The matter is submitted at this time, and I believe that ends our session for the morning.
judges: Paez, Clifton, Kobayashi